Read, J.
(dissenting). Plaintiff Raul Barreto, who worked as an asbestos handler for P.A.L. Environmental Safety Corp. (PAL), suffered on-the-job injuries when he fell into an open manhole because he failed to follow his supervisor’s instruction not to begin to disassemble the temporary wooden enclosure surrounding the manhole until its cover had been put back in place. Since plaintiff’s own actions were the sole proximate cause of his accident, the owners and general contractors — the *439 City of New York (the City), the New York City Transit Authority (NYCTA) and the Metropolitan Transportation Authority (MTA) — are entitled to summary judgment dismissing plaintiffs Labor Law § 240 (1) claim.[1] At a minimum, as Judge Stein points out, on plaintiffs theory of the case there exist questions of fact sufficient to deprive him of partial summary judgment on liability under section 240 (1), the remedy endorsed by the majority.
L
In January 2005, NYCTA and MTA were in the midst of the SONET (synchronous optical network) communications project, which entailed, in the phase then under way, removal of asbestos insulation from underground cables, which were accessed through several hundred individual manholes. The manholes led to confined underground spaces or chambers that were, on average, about 10 feet by 15 feet, anywhere from 10 to 40 feet underground. MTA/NYCTA hired PAL to remove the asbestos insulation from the cables and any asbestos-containing debris. PAL, in turn, retained IMS Safety Inc. as its site safety consultant. In January 2005, PAL was working in spaces accessed through manholes located along Lafayette Street in Lower Manhattan.
The asbestos abatement work began after dark and carried over into the early morning hours. On the shift beginning on January 8 and ending on January 9, 2005, plaintiff was a member of a five-person PAL crew working at manhole 8A on *440 Lafayette Street. The PAL workers cordoned off the area where manhole 8A was located, apparently in or near a parking lane. PAL supplied a generator to power lights to illuminate the work area; specifically, four portable 500-watt halogen lights mounted at street-level on stands.
The PAL workers built a temporary wooden enclosure around the manhole. This enclosure was described variously as either an eight-by-eight-foot or nine-by-nine-foot square; i.e., the size of a small room or shed. As recounted by the MTA’s supervisor on the project, the PAL workers constructed three complete and one partial wall around the manhole by erecting and nailing together wooden panels, leaving a three-foot-wide opening on the incomplete side. They installed two-by-fours diagonally across the top of the enclosure, nailed them into the panels to brace the walls and glued and stapled heavy plastic to these wooden beams to create a ceiling; they placed a double layer of heavy plastic on the enclosure’s interior walls and floor (i.e., the street) and cut out the plastic around the manhole, which was three or four feet in diameter, to expose it.
When this preparatory work was complete, the PAL crew removed the manhole cover to an area outside the enclosure. The IMS safety inspector dropped a gas monitor into the manhole to measure carbon dioxide, oxygen and methane to make sure that the air in the confined underground space was safe to breathe. This monitor remained in place and was connected to an audible alarm to alert the IMS inspector, who was stationed outside the enclosure during the shift, if air quality ever deteriorated to unacceptable levels.
Once the IMS safety inspector confirmed that air quality was acceptable, the PAL workers placed a ladder in the manhole. The ladder extended two or three feet above the level of the enclosure’s floor, which was itself roughly 10 feet above the floor of the underground chamber reached through manhole 8A. The MTA cable foreman climbed down the ladder to make sure there were no high-tension (i.e., more than 600 volts) positive feeders present. Once he confirmed this was the case, the PAL workers put an air lock into place to cover the three-foot opening in the enclosure’s one partial wall,[2] and descended the ladder into the underground space to begin asbestos removal. *441 They were dressed in protective clothing (two complete suits), and were equipped with respirators and 300-watt portable halogen lights. The MTA supervisor and the MTA cable foreman remained at the work site, outside the enclosure, throughout the shift; they spelled each other so at least one of them was always watching the enclosure’s entrance at the air lock to make sure no member of the public intruded.
Once the PAL workers had completed their asbestos abatement work for the shift, they handed up or carted bagged asbestos-containing materials and any tools through the manhole opening into the enclosure. Then they pulled up the ladder. After the IMS safety inspector removed his monitoring equipment from the manhole opening, the PAL workers were supposed to take out the air lock, retrieve the manhole cover from outside the enclosure and cover the manhole. Only then were they required to disassemble the enclosure. The MTA supervisor testified that “[t]he lights are the last thing that they take down because they have to see. That’s a common practice. That’s the last thing they do.” After learning about plaintiff’s accident from the PAL supervisor, the MTA supervisor went to manhole 8A. He observed that both the 500-watt halogen lights and the 300-watt portable lights were present and illuminating the area.
IL
Plaintiff conceded that he knew that he and his coworkers were not supposed to dismantle the wooden enclosure until the cover for manhole 8A had been put back in place. Yet, on January 9, 2005, after the PAL crew completed asbestos abatement work in the underground chamber and plaintiff and his coworkers emerged from the manhole opening, he “right away” began disassembling the enclosure, contrary to his supervisor’s explicit instructions. Stated somewhat differently, plaintiff did not wait for the manhole to be covered, as he had on previous occasions and as he knew he was supposed to do. Plaintiff offered no explanation for his safety lapse, or for his assumption that the manhole must have been covered even though he admittedly was not advised by his supervisor that this was the case, and he did not see his coworkers replace the cover.
Specifically, plaintiff testified as follows:
“Q. Were you aware through your prior work at job sites involving asbestos removal in manholes, that *442 the cover to the manhole should be replaced once the workers and materials were removed from the manhole?
“[Plaintiffs attorney.] Yes or no?
“[Plaintiff.] Yes.”
At another point in his deposition, plaintiff testified additionally as follows:
“Q. When you deconstructed the work area[,] what is the first thing that you do?
“[Plaintiffs attorney.] You mean on [January 9, 2005] or generally?
“Q. Generally?
“[Plaintiffs attorney.] Any manhole job generally?
“Q. Yes, just generally.
“[Plaintiff.] To cover the hole.
“Q. Then what would you do next, generally?
“[Plaintiff.] Remove plastic.”
And later, plaintiff was questioned and answered as follows:
“Q. On the date of your accident, at any time, did the supervisor from P.A.L. tell you that the manhole had to be covered, not by you, but just that it had to be covered before you began the deconstruction of the area?
“[Plaintiff.] Yes.
“Q. When?
“[Plaintiff.] When we began the break down.
“Q. That was the day of your accident, correct? “[Plaintiff.] Correct.
“Q. On the day before your accident, not on the day of your accident, but the day before your accident, did you ever see the manhole being covered by someone?
“[Plaintiff.] Clearly.
“Q. Did you ever cover the manhole with the cover on the days before your accident?
*443 “[Plaintiff.] No.
“Q. Who would cover the manhole?
“[Plaintiff.] The supervisor would say who would cover it. I don’t know. . . .
“Q. On the days before your accident, not on the day of your accident, but on the days before your accident, when you would start deconstructing the work area, were the manholes covered?
“[Plaintiff.] Yes.
“Q. Would you usually wait for the manhole to be covered before you would start the deconstruction of the area?
“[Plaintiff.] Yes.
“Q. When you would wait for the manhole to be covered, where would you wait?
“[Plaintiff.] We would go to the area. There is two areas for decontamination, one area is where the curtains are [i.e., the air lock]. I don’t know who covered — then after it was covered the supervisor would tell us to go in and begin the deconstruction.
“[Plaintiffs attorney.] All I want to know from you, on previous manhole jobs, where would you wait for someone else to put the cover on, that is all that I wanted to know?
“[Plaintiff.] In the curtain area, at the curtain [i.e., in the air lock]. . . .
“Q. So, typically, you would wait in that area when they would place the manhole, cover the manhole; is that what you are telling me?
“[Plaintiff] Yes. . . .
“Q. The days before your accident, would you typically wait for the supervisor to say okay the manhole is covered before you began your deconstruction?
“[Plaintiff.] Yes.”
We have long held that “[ejven when a worker is not ‘recalcitrant,’ . . . there can be no liability under section 240 (1) when *444 there is no violation and the worker’s actions . . . are the ‘sole proximate cause’ of the accident” (Blake v Neighborhood Hous. Servs. of N.Y. City, 1 NY3d 280, 290 [2003] [emphasis added]; see also Cahill v Triborough Bridge & Tunnel Auth., 4 NY3d 35 [2004] [fact issue exists whether the plaintiff’s actions were the sole proximate cause of his injuries when he ignored his supervisor’s specific instruction to use an available safety line while climbing]). Here, the majority concludes that plaintiff established, through the testimony of IMS’s president, Joseph Mazzurco, that there was, in fact, a violation because “there should have been a guardrail system around three sides of the .open manhole while the containment enclosure was being dismantled,” and that “the absence of guardrails was a proximate cause of the accident because had they been in place [,] [plaintiff] would not have fallen” into the manhole (majority op at 433 [emphasis added]). This theory is flawed for several reasons.
First, Mazzurco did not testify as a safety expert. Rather, he described IMS’s role on this project, which he tended to diminish, and his guilty plea to federal mail and wire fraud charges based on alleged falsification of the qualifications and training of certain IMS employees. When asked if it “[w]ould ... be part of IMS’[s] responsibilities to insure that a manhole was covered . . . before PAL began working around the manhole above the surface — on the street level,” Mazzurco answered “hypothetically” that “ [i] f there is protection around [the manhole], then [it’s] not our responsibility because the manhole is protected.” When asked what he meant by protection, he responded “[s]ome sort of barricade system.”
Second, to the extent Mazzurco assumed there was, or should have been, a guardrail system in place around manhole 8A while it was open, he cited no state or federal regulation that compels this. Nor is such a measure mandated by the only regulations that plaintiff mentions; namely, 29 CFR 1910.23 {see 29 CFR 1910.23 [a] [6] [when the required standard manhole cover is not in place, an uncovered floor opening “shall be constantly attended by someone or shall be protected by removable standard railings” (emphasis added)]), and 29 CFR part 1926. The latter provision, which is part of OSHA’s safety and health regulations for construction, states at 29 CFR 1926.501 (“Duty to have fall protection”) as follows:
*445 “(a) General.
“(1) This section sets forth requirements for employers to provide fall protection systems . . .
“(b) . . .
“(4) Holes.
“(i) Each employee on walking/working surfaces shall be protected from falling through holes (including skylights) more than 6 feet (1.8 m) above lower levels, by personal fall arrest systems, covers, or guardrail systems erected around such holes” (emphasis added).
And finally, the protection that the majority claims should have been provided (i.e., a “guardrail system around three sides of the open manhole while the containment enclosure was being dismantled”) makes no sense because the manhole was supposed to be covered before the PAL workers began to disassemble the enclosure. In fact, at no time were the PAL workers authorized or required to work in the vicinity of an open manhole. The cover was not removed until after they constructed the enclosure, at which point, upon receiving clearance from the IMS safety inspector and the MTA cable foreman, they climbed down through the manhole opening into the underground chamber, where they performed their asbestos abatement work. And the cover was to be replaced once they emerged from the manhole after completing their asbestos abatement work for the shift, and before they dismantled the enclosure. A guardrail system, whether installed before or after the PAL workers entered or after they exited the open manhole, would have protected no one other than an intruder, and the enclosure was under constant surveillance by either the MTA supervisor or the MTA cable foreman.
The majority also takes the position that plaintiffs conduct cannot have been the sole proximate cause of his injuries because “it took at least two PAL workers to move the manhole cover (given its weight),” and plaintiff testified “that the lights had been turned off prior to disassembly of the containment enclosure” (majority op at 433-434). With respect to the first point, this is not a case where a supervisor instructed an employee to use safety equipment that was unavailable or somehow unusable for its intended purpose. Plaintiff was never told to replace the manhole cover by himself, and whether it took two or more of the PAL workers in the five-person crew to replace the manhole cover is irrelevant.
*446 In contending otherwise, the majority ignores the distinction we have made between the sole proximate cause and “recalcitrant worker” defenses (see Blake, 1 NY3d at 290; Cahill, 4 NY3d at 39-40; Weininger v Hagedorn & Co., 91 NY2d 958 [1998] [speaking in terms of sole proximate cause and not recalcitrance]; Robinson v East Med. Ctr., LP, 6 NY3d 550 [2006] [noting that the plaintiff did not avail himself of accessible safety devices, but phrasing the standard as one of sole proximate cause]; see also 85 NY Jur 2d, Premises Liability §§ 289, 290 [identifying sole proximate cause and “recalcitrant worker” as separate defenses to Labor Law § 240 (1) claims]). In sum, while recalcitrance is a sufficient predicate for sole proximate cause, it is not a necessary one.
There is to be sure a good argument that plaintiff was not a “recalcitrant worker” because he was unable, by himself, to lift the manhole cover. But plaintiff’s foreman instructed him not to begin dismantling the enclosure until the manhole cover had been replaced, and plaintiff disregarded this basic safety direction, which was the sole proximate cause of his accident: obviously, he would not have fallen into the underground chamber through the manhole opening if he had waited for the manhole to be covered, as he conceded he knew he was supposed to do, and had done on previous occasions. As we observed in Blake, “[extending [Labor Law § 240 (1)] to impose liability in such a case would be inconsistent with statutory goals since the accident was not caused by the absence of (or defect in) any safety device, or in the way the safety device was placed” (1 NY3d at 290). And it is certainly poor public policy to treat employers that direct their workers how to accomplish a task safely and make adequate safety equipment available just the same as employers that make little or no effort in this regard.
Finally, whether someone removed or turned off the 500-watt lights outside the enclosure or, for that matter, extinguished the portable 300-watt lights with which the workers were equipped is disputed. It is difficult to credit plaintiff’s testimony in this regard since the PAL workers themselves were responsible for setting up and taking down the lights; it is hard to believe that they wanted to work in relative dark, and equally hard to explain why a blackout occurred for the first time, according to plaintiff, on this occasion. More importantly, though, this disputed fact is beside the point. Dim or nonexistent lighting would, of course, lend greater credence to plaintiff’s testimony that he did not notice whether any of *447 his coworkers had replaced the manhole cover or that it was missing, even though the crew was a small one working together in close quarters. It does not, however, explain why plaintiff proceeded to disassemble the enclosure without receiving the “okay” from his supervisor, which he testified that he had waited for in the past.
For all these reasons, I conclude that the City, NYCTA and MTA have shown their entitlement to summary judgment dismissing plaintiffs Labor Law § 240 (1) claim on the ground that plaintiffs conduct was the sole proximate cause of his injuries. And even on plaintiffs theory of the case, as Judge Stein shows, there exist facts from which a jury might find that an adequate safety device was nearby at the work site: that plaintiff both knew that the manhole cover was nearby and that he was expected to wait for it to be replaced before he began to dismantle the temporary enclosure; that he chose for no good reason to go ahead without waiting; and that if he had not made that choice, he would not have been injured (see Ca-hill, 4 NY3d at 40). Accordingly, I respectfully dissent.
Chief Judge Lippman and Judges Rivera and Fahey concur; Judge Stein dissents in part in an opinion in which Judge Abdus-Salaam concurs; Judge Read dissents and votes to affirm in an opinion.
Order modified, with costs to plaintiff Raul Barreto, in accordance with the opinion herein and, as so modified, affirmed, and certified question not answered as unnecessary.

. The question whether an uncovered manhole constitutes an elevated work site or presents an elevation-related hazard within the meaning of Labor Law § 240 (1) has divided the Appellate Division (compare Dos Santos v Consolidated Edison of N.Y., Inc., 104 AD3d 606, 608 [1st Dept 2013] [plaintiff who fell into an uncovered manhole suffered injuries “result(ing) from an elevation-related hazard that Labor Law § 240 (1) is intended to obviate”], and Allen v City of Buffalo, 161 AD2d 1134, 1134 [4th Dept 1990] [under the circumstances described, “the uncovered manhole through which decedent fell was an elevated worksite”], with Carey v Five Bros., Inc., 106 AD3d 938, 940 [2d Dept 2013] [injuries suffered by a worker who fell partially through an open manhole “did not arise in the context of the ‘special hazards’ against which (section 240 [1]) is designed to protect”]; see also Coleman v Crumb Rubber Mfrs., 92 AD3d 1128, 1129 [3d Dept 2012] [a worker injured when he partially fell through an unprotected opening in a permanent floor “was not performing his work at an elevation” or any task “warrant(ing) the use of the protective devices required by Labor Law § 240 (1)”]). For the reasons stated by the majority, I also assume, solely for purposes of this appeal, that plaintiff was engaged in work presenting an elevation-related risk when he was injured (see majority op at 433).

. The air lock is the system of two plastic-curtained doorways separated by an estimated four feet described by plaintiff. The purpose of an air lock is to permit entrance and exit while restricting air movement between a contaminated area and an uncontaminated area (see 15 RCNY 1-02).